ESTATE OF Mark A. ARROWOOD, deceased, by Joan L. ARROWOOD, Administratrix, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–3217V.

United States Court of Federal Claims.

May 6, 1993.

Boyd A. England, Doylestown, PA, for petitioner.

David L. Terzian, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

HARKINS, Senior Judge:

Petitioner, the administratrix of the estate of Mark A. Arrowood, seeks review in the United States Court of Federal Claims [1] under the National Childhood Vaccine Injury Compensation Program (the Program) of unpublished orders made by a special master on June 4, 1992, and an order of dismissal with prejudice made on October 28, 1992.

The Program was established in 1986 as part of the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3743, 3758. Amendments in 1987, 1988, 1989, 1990, and 1991 changed substantially procedures applicable to the functions of special masters, and review of decisions of special masters. Provisions governing the Program, as amended, are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West 1991 & Supp.1992). For convenience, further reference to the Program in this order will be to the relevant subsection of "42 U.S.C.A. § 300aa—__." [2]

Mark A. Arrowood (Mark) was born on October 3, 1957. He developed as a healthy baby and was progressing normal-

---

1. On Oct. 29, 1992, the United States Claims Court was renamed the United States Court of Federal Claims, pursuant to Title IX, Section 902 of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992).

2. The Health Information, Health Promotion, and Vaccine Injury Compensation Amendments of 1991, Pub.L. No. 102–168, 105 Stat. 1102 (Nov. 26, 1991) amended Section 12(g)(2) which requires notice to a petitioner when the Claims Court fails to enter a judgment on a petition within 420 days, exclusive of suspension and remand periods. This order constitutes notice to petitioners pursuant to Section 12(g)(2), as amended.

ly until approximately the age of 5 months. On March 21, 1958, Mark received an immunization. On March 22, 1958, in the early morning, Mark began crying strangely, thrashing his arms and legs, and arching his back, and he felt warm. The family physician was called. On arrival at the house he found the baby in a convulsive state, and gave Mark an injection of phenobarbital to stop his seizure. This was Mark's first known seizure. He had additional seizures, and the family physician recommended that Mark undergo an evaluation for the seizure disorder at a neurology clinic in Philadelphia at Children's Hospital. On the clinic's request for immunization records, petitioner, in December 1958, went to the family physician's office where an employee prepared a record by referring to Mark's chart and transcribing the relevant information onto a form captioned: Immunization Record. The family physician's signature appears on the immunization record. Mark was first seen at the Children's Hospital clinic on December 8, 1958; a series of studies were done. On January 14, 1959, the clinic advised the family physician that Mark's condition was a seizure state requiring continuous anticonvulsant medication.

Subsequently, Mark continued to experience numerous seizures, both febrile and afrebile, and at various times was admitted to hospitals for seizure and seizure-related problems. On August 3, 1990, Mark suffered approximately four seizures, and was transported to a hospital, where he died on August 4, 1990. The death occurred from aspiration of vomitus during a seizure.

Petitioner, acting pro se on behalf of her deceased son, filed a petition for compensation under the Program on October 1, 1990. The petition alleged that Mark received a polio vaccine on March 21, 1958, and that on March 22, 1958, 12 hours after the polio inoculation, he suffered a seizure, thus sustaining an encephalopathy and a residual seizure disorder which ultimately led to his death on August 4, 1990. The immunization record was attached to the petition as Exhibit 2.

On September 4, 1991, petitioner, represented by counsel, filed an Amended Petition that, among other matters, alleged that the vaccination administered on March 21, 1958, was not a polio vaccination, but rather was a Diphtheria, Pertussis, Tetanus (DPT) vaccination. Since the immunization record attached to the original Petition documented that a poliomyelitis vaccination was given on March 21, 1958, a factual issue arose regarding the type of immunization administered on that date.

A hearing was held on April 14, 1992, for the sole purpose of determining whether the injection Mark received on March 21, 1958, was a polio vaccine or a DPT vaccination. Petitioner presented the testimony of petitioner, Mrs. Joan Arrowood; Mrs. Mina Chubb, petitioner's mother; and the family physician, Dr. Clifford Laudenslager. Based upon the testimony of the witnesses and the immunization record, the special master found no persuasive evidence that the immunization was a DPT rather than a polio vaccination, that the testimony was insufficient to overcome the medical records, and that petitioner had failed to prove by a preponderance of evidence that the vaccination administered on March 21, 1958, was more likely than not a DPT vaccine. In the June 4, 1992, order, the special master found "that a poliomyelitis immunization was administered on March 21, 1958, as indicated in the medical records."

In a separate order on June 4, 1992, the special master noted that a seizure disorder following an IPV (inactivated polio vaccine) is not a Table injury under Section 14(a), and that petitioner must prove that the vaccine in fact caused the injury. The order also notes that causation-in-fact requires proof of a logical sequence of cause and effect backed by medical opinion and peer-reviewed reported scientific and/or medical literature. The special master directed petitioner to file:

An affidavit from a *clinically qualified medical expert* who attests to a reasonable degree of medical certainty that Mark's encephalopathy and seizure disorder and its sequela were caused-in-fact by an IPV inoculation. Such expert must fully set forth the clinical and scien-

tific bases for any conclusions, supporting the theory of causation by references to relevant peer reviewed literature. Complete copies of any cited literature shall be attached to the affidavit. All experts shall document their expertise in such matters by concurrent submission of curriculum vita. Affidavits which are merely conclusory are not sufficient.

Petitioner filed a Supplemental Petition on September 16, 1992. In lieu of the affidavit, the Petition stated: "Petitioner is unable to provide medical testimony that Mark's encephalopathy and seizure disorder and its sequela were caused by an IPV inoculation as the inoculation Mark received on March 21, 1958, was a DPT inoculation."

By order dated October 28, 1992, petitioner's case was dismissed with prejudice for failure to pursue this case based upon the IPV vaccination so as to prove by causation-in-fact that the injuries were caused by the polio vaccination.

The petition for review of the special master's orders alleges the following errors:

A. The finding set forth in the June 4, 1992 Order that the immunization administered on March 21, 1958 was IPV instead of DPT is arbitrary and capricious in that it is not supported by substantial evidence;

B. The finding is not in accordance with the law in that Petitioner was held to a standard of proof higher than preponderance of the evidence; and

C. The decision is contrary to the weight of the evidence.

In this case, the special master was required to determine, on the basis of the record as a whole, whether the immunization on March 21, 1958, was with polio vaccine or with DPT vaccine. The medical record, which was included in the October 1, 1990, petition as Exhibit 2, was prepared in December 1958. Exhibit 2 states that Mark received combined DPT vaccinations of 0.5 cc each on 1/4/58, 2/5/58, and 2/28/58, and that he received poliomyelitis immunizations on 3/21/58, 5/5/58, and 1/26/59. The Amended Petition on Sep-

tember 4, 1991, and testimony at the hearing on April 14, 1992, assert that the immunization record contains a clerical mistake and that, to be accurate, the 3/21/58 polio date should be exchanged with the 2/28/58 DPT date.

The crux of this case is the discretion of a special master to weigh the reliability of documentary evidence in the record in the light of contrary sworn testimony advanced more than 32 years after the document was prepared.

Petitioner's contentions (that the special master's orders are not supported by substantial evidence, that the standard of proof was applied erroneously, and that the decision to dismiss is contrary to the weight of the evidence) do not take into account the special role of a special master in the Program. The responsibilities and functions of special masters in the Program's amended procedures are unique. The 1989 Amendments established a separate office of special masters within the Court of Federal Claims, administered by a chief special master, and gave that office special authority and considerable administrative independence in decisions on claims for compensation under the Program. Section 12(c). The 1989 Amendments directed promulgation of separate rules for special masters, and established specific criteria the rules were to contain. Section 12(d)(2). Standards were established for conduct of proceedings on a petition. Section 12(d)(3)(B). Review of a special master's decision by the Court of Federal Claims is expected to be an exceptional occurrence rather than a routine procedure.

Review of a special master's decision in the Court of Federal Claims is of a very limited nature. This court may not set aside any findings of fact of the special master unless such findings of fact are "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This court may not set aside any conclusion of law of the special master unless such conclusion of law is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Section 12(e)(2)(B). Is-

sues of fact and questions of law are examined in the Court of Federal Claims under the same standard of review.[3] In the absence of such findings, this court either must uphold the findings of fact and conclusions of law and sustain the decision or remand the petition to the special master for further action in accordance with the court's directions. Sections 12(e)(2)(A) and (C).

The "arbitrary and capricious" test in Section 12(e)(2)(B) is a highly deferential standard of review. "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991). Rationality is the touchstone of the arbitrary, capricious, abuse of discretion or otherwise not in accordance with law standard of review. Fact findings are reviewed under the arbitrary and capricious standard. Legal questions are reviewed under the "not in accordance with law" standard, and discretionary rulings are reviewed under the abuse of discretion standard. *See Munn*, 970 F.2d at 870, n. 10; *Hyundai Electronics Indus. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir. 1990).

The Court of Federal Claims may not substitute its own judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the special master has relied on factors which

Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

The Vaccine Rules, RCFC Appendix J, implement the special procedures established in the statute. There is no discovery as a matter of right; informal and cooperative exchange of information is the ordinary and preferred practice. RCFC Appendix J, Rule 7. The special master determines the format for taking evidence and hearing argument. In receiving evidence, the special master is not bound by common law or statutory rules of evidence. Consideration of all evidence is governed by principles of fundamental fairness to both parties. Argument may be received by telephone conference call, at a hearing, or in written submissions as determined by the special master. A case may be decided on the basis of written filings, without an evidentiary hearing. RCFC Appendix J, Rule 8.

Petitioner's contention that the special master's findings are arbitrary and capricious centers on application of substantial evidence concepts to Exhibit 2. The argument is that Exhibit 2 was not a contemporaneous medical record, was not prepared in accordance with normal office procedures, and is nothing more than written hearsay evidence. Petitioner cites *McKee v. United States*, 205 Ct.Cl. 303, 500 F.2d 525, 528 (1974) for the proposition where hearsay evidence opposes sworn testimony, in the absence of sufficient assurance of its truthfulness, hearsay cannot be substantial evidence to overcome sworn testimony of a claimant. *McKee* involved a judicial review

3. CAFC decisions reflect ambiguity as to the standard of review in that court of a decision by the Court of Federal Claims on questions of law. *See Bradley v. Secretary of Dep't of Health & Human Servs.*, 991 F.2d 1570, 1576, n. 4 (Fed. Cir.1993) (de novo review of Court of Federal Claims decision); *Munn v. Secretary of Dep't of*

*Health & Human Servs.*, 970 F.2d 863, 870 & 871, n. 11 (Fed.Cir.1992) (judgment of the Court of Federal Claims may not be disturbed "unless we find that judgment to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

pursuant to standards of the Wunderlich Act of findings by an administrative board under the disputes clause of a construction contract. The concepts of "substantial evidence" developed under Wunderlich Act standards bear no relationship to the functions of special masters in this unique Program. Nuances of "substantial evidence" developed in judicial review of contract disputes have no place in the Program. Attempts to graft such "substantial evidence" concepts to Program procedures is contrary to the objectives of the Vaccine Compensation Program.

Exhibit 2, admittedly, is written hearsay, as are many medical records. Although it was not created contemporaneously with the events it purports to document, it was extracted from relevant office records made at the time the events occurred. It is certainly closer in time to the events which are its subject than the testimony offered by petitioner's witnesses at a hearing more than 32 years later.

The special master considered circumstances that tended to show Exhibit 2 was reliable. Exhibit 2 coincided with the family physician's normal practice of commencing polio immunizations after the last injection of DPT. The family physician admitted that his signature appears twice on Exhibit 2. The signature is an indication that the family physician believed that the immunization record correctly reflected actual events.

The special master is not bound by the rules of evidence. "In receiving evidence, the special master will not be bound by common law or statutory rules of evidence. The special master will consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties." RCFC, Appendix J, Rule 8(b). A record created in the normal course by an employee of the family physician should receive more weight than oral testimony given years after the event. *See Murphy v. Secretary Dep't of Health & Human Servs.*, 23 Cl.Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed.Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992). ("It has generally been held that oral testi-

mony which is in conflict with contemporaneous documents is entitled to little evidentiary weight."). The special master has discretion to conclude, on the basis of the record as a whole, that Exhibit 2, created directly from Mark's medical records, is more persuasive than the subsequent oral testimony of the family physician.

Petitioner's second argument is that the special master's findings were not in accordance with law because he held petitioner to a standard higher than preponderance of the evidence. "The standard of proof required by the [Vaccine] Act is simple preponderance of the evidence; not scientific certainty." *Bunting v. Secretary of Dep't of Health & Human Servs.*, 931 F.2d 867, 873 (Fed.Cir.1991). "... [T]he petitioner must adduce evidence that makes the existence of a contested fact more likely than not." *McClendon v. Secretary Dep't of Health & Human Servs.*, 23 Cl.Ct. 191, 195 (1991) (citing *Black's Law Dictionary* 1064 (5th ed. 1979)). Petitioner alleges that the special master held petitioner to an absolute standard equal to scientific certainty because the June 4, 1992, order indicated that the family physician could not testify with absolute certainty as to whether the immunization record reflected a possible scenario.

The special master did not hold petitioner to a higher standard. The reference to "absolute" merely reflects that the family physician was uncertain as to the exact events that occurred many years ago. The family physician did not testify that it was "virtually impossible for him to have given a DPT injection in accordance with the schedule set forth in [Exhibit 2]." He did testify that he did not know of a time when he had administered a DPT shot less than 30 days from a prior shot, not that it would be impossible to do so.

Petitioner asserts that the special master's rejection of the grandmother's testimony because of the passage of time, her lack of conviction, and the unreliable hearsay nature of her testimony was not in accordance with the law. Petitioner claims that the special master should have accept-

ed her testimony under the preponderance of the evidence standard. Petitioner accuses the special master of failing to weigh the evidence because he did not thoroughly explain his reason for dismissing the grandmother's testimony.

It is clear that the special master in observing the witnesses and their demeanor when testifying is not bound by such testimony which he deems inconsistent, inconclusive, inherently unreliable, built on an incorrect premise, illogical, or simply not credible. The special master may believe all, part, or none of the testimony of any witness. Thus, even if the grandmother's testimony was not hearsay, it was harmless error under the special master's discretionary authority to weigh the testimony of any witness and give it little or no weight. Clearly, the special master appropriately applied the correct burden of proof in this case after weighing all the evidence including the testimony of the witnesses, and Exhibit 2, which clearly documents the administration of a polio vaccination on March 21, 1958, rather than a DPT vaccination.

■ Petitioner appears to argue that she should prevail based only on the quantity of testimony adduced when weighed against contrary evidence. In determining a preponderance of the evidence, it is not simply the volume or quantity of evidence which is at issue, but the quality of such testimony. The special master is entitled to credit the evidence which he finds reasonable and appropriate and to discredit that evidence which he finds less persuasive and irrelevant.

■ Petitioner's third argument alleges that the decision contains six errors which are contrary to the weight of evidence. One such alleged error is that the special master stated that the person preparing the record was a nurse. Petitioner mischaracterizes the special master's statement. Nevertheless, whether the preparer was a nurse is irrelevant. The preparer was an employee of the family physician and he confirmed the accuracy of the record by signing it in two places.

The remaining alleged errors have been considered. They also are either irrelevant or add nothing to the dispositive issues in this case.

On the basis of the record in this case, petitioner has not shown that the special master's findings of fact and conclusions of law are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, the findings of fact and conclusions of law of the special master are upheld and the decision is sustained. The Clerk is directed to enter judgment in accordance with the orders of the special master.